UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



'08 CIV 6245

|  |  |
|---|---|
| JO ANNE BUZZO, individually and on behalf of all others similarly situated, | x : : : |
| Plaintiff, | : |
| v. | : : |
| LEHMAN BROTHERS HOLDINGS INC., Wendy M. Uvino, Lehman Brothers Holdings Inc. Employee Benefit Plans Committee, John Does 1-10, Henry Kaufman, John F. Akers, Roger S. Berlind, Marsha Johnson Evans and Roland A. Hernandez. | : : : : : : : |
| Defendants. | : : x |

Case No

RECEIVED
JUL 10 2008
U.S.D.C. S.D. N.Y.
CASHIERS

CLASS ACTION COMPLAINT

Plaintiff, Jo Anne Buzzo ("Plaintiff"), individually, as a representative of the Lehman

Brothers Savings Plan ("Plan"), and on behalf of a class of similarly situated participants in the

Plan (the "Participants"), by her attorneys, alleges the following for her Complaint

("Complaint"):

## I. **NATURE OF THE ACTION**

1.      Plaintiff, a Participant in the Plan, brings this action against Lehman Brothers

Holdings Inc. ("Lehman Brothers" or the "Company") and others individually, as a representative

of the Plan and on behalf of a class of all Participants in the Plan for whose individual accounts

the Plan invested in the Lehman Brothers Common Stock Fund (the "Fund") from September 13,

2006 to June 6, 2008 (the "Class Period"). Plaintiff brings this action on behalf of both the Plan

and the Plan's Participants and beneficiaries pursuant to § 502(a)(2) and (3) of the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2.     As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these breaches, Defendants are liable to the Plan for all losses resulting from each such breach of fiduciary duty. Plaintiff also seeks equitable relief.

3.     Plaintiff's claims arise out of Lehman Brothers' misrepresentations and failures to disclose material adverse facts concerning:

a.     the Company's financial results, insofar as they did not properly reflect the financial impact that problems in the residential sub-prime mortgage market were having on the Company;

b.     the nature and extent of the Company's financial exposure to the residential sub-prime mortgage market; and

c.     the Company's changes in valuation of assets tied to the residential sub-prime mortgage market.

4.     These improper activities artificially inflated the value of Fund and Lehman Brothers stock shares. Yet, throughout the Class Period, the Plan continued to invest in the Fund and the Fund continued to invest in Lehman Brothers' stock.

5.     Plaintiff alleges that it was imprudent to permit the Plan to invest in the Fund and the Fund to invest in Lehman Brothers' stock because the prices of shares of the Fund and Company stock were artificially inflated. Plaintiff also alleges that Defendants breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning the Plan's assets, benefits and investing in the Fund.

Finally, Plaintiff alleges that those Defendants who had a duty to appoint and monitor those

fiduciaries with authority or control over Plan assets breached their duty to appoint and monitor.

## II. JURISDICTION AND VENUE

6. Plaintiff's claims arise under and pursuant to ERISA § 502, 29 USC § 1132.

7. This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29

U.S.C. § 1132(e)(1).

8. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. §

1132(e)(2), because this is the district where the Plan is administered, where the breaches took

place and where one or more defendants reside or may be found.

## III. THE PARTIES

9. Plaintiff Jo Anne Buzzo is a resident of the State of California. Plaintiff is a

Participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

10. Defendant Lehman Brothers Holdings Inc. is a Delaware Corporation with its

principal executive offices located at 745 Seventh Avenue, New York, NY.

11. Defendant Lehman Brothers Holdings Inc. Employee Benefit Plans Committee

("Committee") is, on information and belief, an unincorporated association and, according to the

Plan's Form 11-K Annual Report filed with the United States Securities and Exchange

Commission ("SEC") on June 29, 2007 ("2007 Form 11-K"), the Plan Administrator of the Plan.

12. Defendant Wendy Uvino ("Uvino") is a senior vice president and global head of

Lehman Brothers' employee benefits. According to Lehman Brothers' corporate website,

http://www.lehman.com/events/2004LBGLN/DPBenefits_details.html as of June 30, 2008, "In

her role, Ms. Uvino manages all aspects of the Firm's benefits programs, and oversees the Human

3

Resources data management function." Uvino is the chairperson of the Committee, as is evidenced by signing the 2007 Form 11-K in that capacity. Uvino signed the Plan's Form 5500 Annual Return filed with the United States Internal Revenue Service ("IRS") on October 15, 2007 (2007 Form 5500), as "Plan Administrator."

13.     Defendants John Does 1-10 are members of the Committee (together with Uvino, "Committee Members") whose names are not currently known.

14.     Upon information and belief, the Committee Members were all Lehman Brothers senior officers and employees who served on the Committee without additional compensation in the ordinary course of their employment and who exercised authority or control over the Plan, Plan assets and/or the Fund. This belief is based, in part, on the fact that Uvino is a Lehman Brothers "Senior Vice President." As a result of their senior positions within the Company, the Committee Members knew or should have known all of the facts alleged herein.

15.     Upon information and belief, the Lehman Brothers Board of Directors ("Board"), through the Finance and Risk Committee, had the duty to appoint and monitor the members of the Committee and the Plan Trustee. The Board as an entity and each of the following who were members of the Board during some or all of the Class Period are named as Defendants: Henry Kaufman, John F. Akers, Roger S. Berlind, Marsha Johnson Evans and Roland A. Hernandez. (collectively the "Director Defendants").

## IV.  DESCRIPTION OF THE PLAN

16.     The Plan is an employee benefit Plan within the meaning of ERISA § 3(3) and 3(2)(A), 29 U.S.C. § 1002(3) and 1002(2)(A), and it is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible

individual account plan" within the meaning of ERISA §407(d)(3), 29 U.S.C. §1 107(d)(3), and a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k).

17.     The Plan is a "defined contribution" or "individual account" Plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

18.     The Plan is a voluntary contribution Plan whereby Participants may contribute between one and fifty percent of their eligible employment compensation to the Plan ("Employee Contributions").

19.     Participants could direct the Plan to invest Plan assets held in their individual accounts among a number of Investment Options offered by the Plan.  Among the Investment Options which Participants could select for investment of their Plan accounts was the Fund.

20.     The Company matched certain participant contributions by making contribution to the respective individual accounts ("Matching Contributions).

21.     According to the 2007 Form 11-K:

The Company provides a discretionary matching contribution, in Lehman stock or cash, on behalf of eligible participants who have a twelve month period of service, as defined by the Plan document, and are employees on the last day of the Plan year. The amount of the discretionary contribution, if any, will be determined by the Company's Board of Directors.

22.     "For the 2006 and 2005 Plan years, Company contributions were made in cash, which was invested in the Lehman Brothers Common Stock Fund." (2007 Form 11-K).

23.     All Matching Contributions were initially invested into the Fund. However, Participants could then direct those contributions into other investment options. According to the 2007 Form 11-K:

> Although the basic and discretionary employer matching contributions are directly invested into the Lehman Common Stock Fund, participants immediately have the right to diversify out of this fund.

24.     The assets of the Plan were held in trust by Fidelity Management Trust Company ("Fidelity"), pursuant to a trust agreement executed between Fidelity and, on information and belief, by the Board and/or the Company (the "Trust"). This appointment was reported in the Plan's Form 11-K filed with the SEC on July 15, 2002.

## V. DEFENDANTS WERE FIDUCIARIES

25.     At all times relevant to this Complaint, Defendants were fiduciaries of the Plan because:

(a)     they were so named; and/or

(b)     they exercised authority or control respecting management or disposition of the Plan's assets; and/or

(c)     they exercised discretionary authority or discretionary control respecting management the Plan; and/or

(d)     they had discretionary authority or discretionary responsibility in the administration of the Plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

26.     In that regard, a person is a fiduciary even if a plan does not name him as such or by its terms assign fiduciary duties to him where by his conduct he engages in fiduciary activities. The test for whether a person (or entity) is a fiduciary is functional and based on actual conduct. Those who have control over management of a plan or plan assets are fiduciaries regardless of the labels or duties assigned to them by the language of a plan. Moreover, in order to fulfill the express remedial purpose of ERISA, the definition of "fiduciary" is to be construed broadly.

27.     A fiduciary may not avoid his fiduciary responsibilities under ERISA by relying solely on the language of the plan documents. While the basic structure of a plan may be specified within limits by the plan sponsor, the fiduciary may not follow the plan document if to do so leads to an imprudent result under ERISA § 404(a)(1)(d), 29 U.S.C. § 1104(a)(1)(D).

28.     The Committee and the Committee Members were fiduciaries because the Committee was the Named Fiduciary and Plan's Administrator. The Committee was responsible for managing the Plan on a day to day basis. In addition, on information and belief, the Committee established guidelines for Plan investments and selected and monitored the investment options for the Plan, including the Fund. The Committee and the Committee Members were thus fiduciaries because they exercised authority or control over the management and disposition of Plan assets.

29.     Lehman Brothers was the Sponsor of the Plan. It is a fiduciary in that it managed, administered and operated the Plan, exercised authority or control over the management and disposition of Plan assets and disseminated Plan communications to Participants. In particular:

7

a.      On information and belief, the Committee delegated its responsibility for administering the Plan to non-committee employees of Lehman Brothers.  Pursuant to this delegation, Lehman Brothers, in fact, administered the Plan.

b.      Upon information and belief, Lehman Brothers, through its treasury, human resources, and legal departments, directed Fidelity concerning the investment of Plan's assets in the Fund and the Fund's assets in Lehman Brothers' stock.

c.      Upon information and belief, the Committee met infrequently and spent very little time on matters relating to administration of the Plan and the Plan's investments. Rather, upon information and belief, these jobs were performed by Lehman Brothers' employees acting in the scope of their day to day duties and, in particular, by Lehman Brothers' human resources, legal, corporate communications, finance and treasury personnel.  In particular, on information and belief, Lehman Brothers' employees monitored Plan investments, and communicated with Participants concerning Plan investments and investment risk and return characteristics, including the Fund.

d.      Upon information and belief, the Committee Members were appointed and served on the Committee as part of and in the ordinary course of their Lehman Brothers job responsibilities without any additional compensation.  Accordingly, the Company is responsible and liable for their actions.

e.      Lehman Brothers, through its Board of Directors, appointed the Committee Members and, therefore, is responsible for the appointment and monitoring of the Committee.

30.   The Director Defendants were fiduciaries of the Plan because they had the fiduciary duty to appoint and monitor the members of the Committee. They had the power and responsibility to appoint as members of the Committee persons with sufficient education, knowledge and experience to inform themselves as necessary to perform their duties as committee members, including the duty to evaluate the merits of investment options under the Plan. The Director Defendants also had an ongoing duty to ensure that the persons appointed to the Committee were fully informed and performing their duties properly with respect to the selection of investment options under the Plan and the investment of the assets of the Plan.

## VI. FIDUCIARY DUTIES UNDER ERISA

31.   **The Statutory Requirements.** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

32.   **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty-- that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ."

33.     The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.   A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

34.     **The Duty of Prudence.**  Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence--that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

35.     **The Duty to Inform.**  The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.  These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

36.     Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants.  Defendants were required to furnish the SPD and a Prospectus to Participants.  The SPD, the Prospectus and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan

and in making decisions concerning their benefits and investment and management of assets

allocated to their accounts:

> The format of the summary plan description must not have the effect of
> misleading, misinforming or failing to inform participants and beneficiaries. Any
> description of exceptions, limitations, reductions, and other restrictions of plan
> benefits shall not be minimized, rendered obscure or otherwise made to appear
> unimportant. Such exceptions, limitations, reductions, or restrictions of plan
> benefits shall be described or summarized in a manner not less prominent than the
> style, captions, printing type, and prominence used to describe or summarize plan
> benefits. The advantages and disadvantages of the plan shall be presented without
> either exaggerating the benefits or minimizing the limitations. The description or
> summary of restrictive plan provisions need not be disclosed in the summary plan
> description in close conjunction with the description or summary of benefits,
> provided that adjacent to the benefit description the page on which the restrictions
> are described is noted.

29 C.F.R. § 2520.102-2(b). Here, on information and belief, Defendants purported to make that

required disclosure concerning the Fund by incorporating by reference into the Prospectus and/or

Summary Plan Description ("SPD") all of Lehman Brothers' filings under Sections 13(a) and (c),

14 and/or 15 of the Securities Exchange Act.

37.    **The Duty to Investigate and Monitor Investment Alternatives.**  With respect

to a pension plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct

an independent investigation into, and continually to monitor, the merits of the investment

alternatives in the Plan including employer securities, to ensure that each investment is a suitable

option for the Plan.

38.    **The Duty to Monitor Appointed Fiduciaries.**  Fiduciaries who have the

responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus

appointed.  The duty to monitor entails both giving information to and reviewing the actions of

11

the appointed fiduciaries. In a 401(k) plan such as the Plan the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

        (a)     possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

        (b)     are knowledgeable about the operations of the Plan the goals of the Plan and the behavior of Plan's participants;

        (c)     are provided with adequate financial resources to do their jobs;

        (d)     have adequate information to do their jobs of overseeing the Plan investments with respect to company stock;

        (e)     have access to outside, impartial advisors when needed;

        (f)     maintain adequate records of the information on which they base their decisions and analysis with respect to Plan investment options; and

        (g)     report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on fiduciaries.

    39.    **The Duty Sometimes to Disregard Plan Documents**. A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

40.  **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary breaches within the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)  if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)  if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)  if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

41.  **Non-Fiduciary Liability**.  Under ERISA non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## VII.  PARTICIPANTS ARE NOT RESPONSIBLE FOR IMPRUDENT PLAN INVESTMENTS

42.  The fact that Participants selected investments from options pre-selected by Defendants is no defense in this case.  Fiduciaries can shift liability for imprudent investments to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet five specific requirements:

(a)  they disclose in advance the intent to shift liability to Participants;

13

(b)     they designate the Plan as a "404(c) plan" and adequately communicate this to Participants;

(c)     they ensure that Participants are not subject to undue influence;

(d)     they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and

(e)     they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law. In this regard, fiduciaries have a choice: they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments. 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

43.     Here, Defendants purported to make that required disclosure concerning the Fund by incorporating by reference into the SPD and Prospectus all of Lehman Brothers' filings under Sections 13(a) and (c), 14 and/or 15 of the Securities Exchange Act.

44.     Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations.

## VIII. SUBSTANTIVE ALLEGATIONS

45.     These claims arise out of the Company's involvement in the sub-prime loan market. "Sub-prime loans" generally refer to those loans made to borrowers with weakened credit histories typically characterized by payment delinquencies, previous charge-offs, judgments, or bankruptcies; low credit scores; high debt-burden ratios; or high loan-to-value ratios.

46.     Sub-prime mortgage loans have been bundled with other mortgages, repackaged, securitized and offered to investors as mortgage backed securities. Mortgage backed securities are sold in the form of various commercial instruments, but principally as bonds and collateralized debt obligations ("CDOs").

47.     CDOs separate credit risk among different tranches: senior tranches (rated AAA), mezzanine tranches (AA to BB), and equity tranches (unrated).

48.     Rating agencies like Moody's, Fitch or Standard & Poor's rate CDOs according to their tranches to let investors know the chances of default.

49.     Prior  to and during the Class Period, Lehman Brothers originated and invested in CDOs and other sub-prime mortgage backed derivatives.

50.     During the Class Period, Lehman Brothers touted the quality of its CDO portfolio and misrepresented and failed to disclose the risks of owning these securities.

51.     On September 13, 2006, Lehman Brothers issued a press release announcing the Company's financial results for the third quarter of 2006. The press release stated in part:

> NEW YORK, September 13, 2006 — Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $916 million for the third quarter ended August 31, 2006, or $1.57 per common share (diluted), representing increases of 4% and 7%, respectively, from net income of $879 million, or $1.47 per common share (diluted), reported for the third quarter of fiscal 2005. Second quarter fiscal 2006 net income was $1.0 billion, or $1.69 per common share (diluted).
>
> For the first nine months of fiscal 2006, the Firm reported record net income of $3.0 billion, or $5.09 per common share (diluted), up 23% and 26%, respectively, from the first nine months of fiscal 2005.

* * *

15

Net revenues (total revenues less interest expense) for the third quarter of fiscal 2006 increased to $4.2 billion, up 8% from $3.9 billion in the third quarter of fiscal 2005, and down 5% from $4.4 billion in the second quarter of fiscal 2006. Net revenues for the first nine months of fiscal 2006 increased 19%, to a record $13.1 billion, from $10.9 billion for the first nine months of fiscal 2005.

* * *

Fixed Income Capital Markets net revenues increased 6% to $2.0 billion in the third quarter of fiscal 2006 from $1.9 billion in the third quarter of 2005, reflecting record results in real estate and strong results in foreign exchange products, partially offset by lower performances within mortgages, high yield and interest rate products.

* * *

52.     Commenting on the financial results, Richard S. Fuld, Jr. ("Fuld"), the Company's Chief Executive Officer and Chairman of the Board of Directors, stated the following:

Market conditions during the third quarter were clearly more challenging than during the first half of the year. However, despite the market environment and the typically slower activity of the summer months, these results are our best third quarter results ever. These results also contributed to our best nine months ever, which were driven by record performances across all segments and regions. This performance demonstrates the Firm's ability to partner with our clients across cycles and to continue to deliver consistent returns to our shareholders.

53.     On October 10, 2006, the Company filed its quarterly report on Form 10-Q for the third quarter of 2006 with the SEC ("Third Quarter 2006 Form 10-Q"). The Third Quarter 2006 Form 10-Q reaffirmed the Company's financial results previously announced on September 13, 2006.

54.     On December 14, 2006, Lehman Brothers issued a press release announcing the Company's financial results for the fourth quarter of 2006 and for the fiscal year 2006. The press release stated in pertinent part as follows:

NEW YORK– December 14, 2006 – Lehman Brothers Holdings Inc. (ticker

16

symbol: LEH) today reported net income of $1.0 billion, or $1.72 per common share (diluted), for the fourth quarter ended November 30, 2006, representing increases of 22% and 25%, respectively, from net income of $823 million, or $1.38 per common share (diluted), reported for the fourth quarter of fiscal 2005. Third quarter fiscal 2006 net income was $916 million, or $1.57 per common share (diluted).

For the 2006 full fiscal year, net income and earnings per common share (diluted) increased 23% and 25%, respectively, to a record $4.0 billion and $6.81, respectively, compared to $3.3 billion and $5.43, respectively, in fiscal 2005.

55.     Commenting on the financial results, Fuld stated:

Once again, we have achieved outstanding results across all our business segments and geographic regions this year. Our record performance is the result of our client-focused strategy and our continued investment in strategic areas that enable us to deliver the best capabilities, intellectual capital and solutions to our clients. As always, our success is a tribute to how well our people continue to work together across the Firm to deliver superior value to our clients and shareholders

56.     On February 13, 2007, the Company filed its annual report for fiscal year 2006 on Form 10-K with the SEC ("2006 Form 10-K"). The Company's 2006 Form 10-K reaffirmed the financial results previously announced on December 14, 2006.

57.     On March 14, 2007, Lehman Brothers issued a press release announcing the financial results for the first quarter 2007. The press release stated in part:

NEW YORK– March 14, 2007 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported record net income of $1.15 billion, or $1.96 per common share (diluted), for the first quarter ended February 28, 2007, representing increases of 6% and 7%, respectively, from net income of $1.09 billion, or $1.83 per common share (diluted), reported for the first quarter of fiscal 2006. Fourth quarter fiscal 2006 net income was $1.00 billion, or $1.72 per common share (diluted). The 2006 first quarter results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

* * *

Fixed Income Capital Markets reported net revenues of $2.2 billion,
its second highest revenue quarter and an increase of 3% from $2.1 billion in
in the first quarter of fiscal 2006, reflecting record results in credit products
as well as a strong performance in real estate, partially offset by declines in
products due to weakness in the U.S. residential mortgage sector and in interest
rate products.

58.     On April 9, 2007, the Company filed with the SEC its quarterly report on Form 10-Q

for the first quarter of 2007 ("First Quarter 2007 Form 10-Q"). The First Quarter 2007 Form 10-Q

reaffirmed the Company's financial results previously announced on March 14, 2007.

59.     On June 12, 2007, Lehman Brothers issued a press release announcing the

financial results for the second quarter of 2007. The press release stated in part:

NEW YORK– June 12, 2007 – Lehman Brothers Holdings Inc. (ticker symbol:
LEH) today reported record net income of $1.3 billion, or $2.21 per common
share (diluted), for the second quarter ended May 31, 2007, representing increases
of 27% and 31%, respectively, from net income of $1.0 billion, or $1.69 per
common share (diluted), reported for the second quarter of fiscal 2006. Net
income and earnings per common share (diluted) for the second quarter of fiscal
2007 increased 11% and 13%, respectively, from net income of $1.1 billion, or
$1.96 per common share (diluted), reported for the first quarter of fiscal 2007.
For the first half of fiscal 2007, the Firm reported record net income of $2.4
billion, or $4.17 per common share (diluted), up 16% and 18%, respectively, from
net income of $2.1 billion, or $3.52 per common share (diluted) for the first half
of fiscal 2006. The 2006 first half results include an after tax gain of $47 million,
or $0.08 per common share (diluted), from the cumulative effect of a change in
accounting principle associated with the Firm's adoption of SFAS 123R on
December 1, 2005.

* * *

Fixed Income Capital Markets reported net revenues of $1.9 billion,
a decrease of 14% from $2.2 billion in the second quarter of fiscal 2006,
as strong client demand across most products and increased real estate and credit
product revenues were more than offset by continued weakness in the U.S.

residential mortgage business and decreased revenues in the Firm's
municipal and interest rate products businesses.

60.     On July 10, 2007, the Company filed with the SEC its quarterly report on Form 10-Q

for the second quarter of 2007 ("Second Quarter 2007 Form 10-Q"). The Second Quarter 2007 Form

10-Q was revealed that the Company had "unrealized" losses totaling $459 million in the second

quarter from mortgages and mortgage backed assets in the Company's inventory.

61.     After this announcement, Lehman Brothers' stock declined $3.76 per share,

or over 5 percent, to close on July 10, 2007 at $71.10 per share.  Although this news had a negative

effect on the value of Lehman Brothers shares, the Company's stock price still remained inflated as

Lehman Brothers continued to conceal the true extent of the Company's exposure to the mortgage

crisis and the credit market downturn. In fact, on July 18, 2007, *Bloomberg* published an article

entitled "Lehman Brothers Says Subprime Speculation 'Unfounded.' " The article stated in pertinent

part as follows:

> Lehman Brothers Holdings Inc., the largest underwriter of U.S.
> bonds, denied speculation that it may face greater potential losses from
> subprime mortgages than previously disclosed.
>
> Speculation about a planned announcement from Lehman related to its subprime
> holdings spurred investors to demand higher premiums to insure against the risk
> of owning Wall Street firms' bonds and helped prompt gains in Treasuries,
> according to traders including Thomas Tucci, head of U.S. government bond
> trading at RBC Capital Markets in New York.
>
> "The rumors related to subprime exposure are unfounded," Lehman
> spokeswoman Kerrie Cohen said today.

62.     On September 18, 2007, Lehman Brothers issued a press release announcing

The financial results for the third quarter of 2007. The press release stated in part:

NEW YORK– September 18, 2007 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $887 million, or $1.54 per common share (diluted), for the third quarter ended August 31, 2007, representing decreases of 3% and 2%, respectively, from net income of $916 million, or $1.57 per common share (diluted), reported for the third quarter of fiscal 2006. Net income and earnings per common share (diluted) for the second quarter of fiscal 2007 were $1.3 billion and $2.21, respectively.

For the first nine months of fiscal 2007, the Firm reported record net income of $3.3 billion, or $5.71 per common share (diluted), up 10% and 12%, respectively, from net income of $3.0 billion, or $5.09 per common share (diluted) for the first nine months of fiscal 2006. The 2006 results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.

* * *

Fixed Income Capital Markets reported net revenues of $1.1 billion, a decrease of 47% from $2.0 billion in the third quarter of fiscal 2006, primarily due to lower performances within Credit and Securitized Products. Within Fixed Income Capital Markets, the Firm recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions. These losses were partially offset by large valuation gains on economic hedges and other liabilities. The result of these valuation items was a net reduction in revenues of approximately $700 million.

63.    Commenting on the financial results, Fuld stated the following:

Despite challenging conditions in the markets, our results once again demonstrate the diversity and financial strength of the Lehman Brothers franchise, as well as our ability to perform across cycles. For the quarter, we reported record net revenues in Investment Management, and our second highest net revenues in both Investment Banking and Equities Capital Markets. In addition, more than half of our net revenues for the quarter came from outside the U.S. We remain focused on delivering significant long term value for our clients and shareholders.

64.    In a conference call on September 18, 2007, Christopher M. O'Mera ("O'Mera"), who was the Company's Chief Financial Officer, Controller and Executive Vice President until December 2007, discussed financial results and cited Lehman Brothers' "strong" risk management

and liquidity position as a "competitive advantage" separating Lehman Brothers from other troubled

Wall Street firms.  O'Mera claimed Lehman Brothers liquidity position was "stronger than ever":

> We attribute this performance to several factors: Our strong risk management culture with regards to the setting of risk limits and the management of market and counterparty credit risks; and our strong liquidity framework . . .

* * *

> To reiterate, our liquidity position is stronger than ever, we consider our liquidity framework to be a competitive advantage which positions us to support our clients and take advantage of market opportunities even in a stress environment.

* * *

> Before we move on to outlook, I wanted to make a few comments about fair value and marking to market. As I know it has been the subject of much discussion in the marketplace. First of all, we carry all of our financial instruments, inventory and lending commitments at fair value. We have a robust process in place in which employees, independent of the businesses, review the marks for accuracy or reasonableness using all the information available in the marketplace including third-party pricing sources where applicable.

* * *

> So overall, despite the fact that some amount of judgment has to be used in determining fair values in a distressed environment, we feel very good about our process of marking-to-market and the marks themselves. Historically, our prudent approach to valuing positions has proven out in past distressed environments.

65.    On October 10, 2007, the Company filed with the SEC its quarterly report on

Form 10-Q for the third quarter of 2007 ("Third Quarter 2007 Form 10-Q"). The Third Quarter 2007

Form 10-Q reaffirmed the financial results previously released on September 18, 2007.

66.    On December 13, 2007, Lehman Brothers issued a press release announcing the

financial results for the fourth quarter and fiscal year 2007. The press release stated in relevant

part:

> NEW YORK– December 13, 2007 – Lehman Brothers Holdings Inc. (ticker symbol: LEH) today reported net income of $886 million, or $1.54 per common share (diluted), for the fourth quarter ended November 30, 2007, representing decreases of 12% and 10%, respectively, from net income of $1.0 billion, or $1.72 per common share (diluted), reported for the fourth quarter of fiscal 2006. For the third quarter of fiscal 2007, net income was $887 million, or $1.54 per common share (diluted).
>
> For the 2007 full fiscal year, net income and earnings per common share (diluted) increased 5% and 7%, respectively, to a record $4.2 billion and $7.26, respectively, compared to $4.0 billion and $6.81, respectively, in fiscal 2006. The 2006 results include an after-tax gain of $47 million, or $0.08 per common share (diluted), from the cumulative effect of a change in accounting principle associated with the Firm's adoption of SFAS 123R on December 1, 2005.
>
> \* \* \*
>
> Fixed Income Capital Markets recorded negative valuation adjustments on trading assets, principally in the Firm's Securitized Products and Real Estate businesses. These valuation adjustments were offset, in part, by valuation gains on economic hedges and liabilities, as well as realized gains from the sale of certain leveraged loan positions, resulting in a net revenue reduction in Fixed Income Capital Markets of approximately $830 million.

67.    Commenting on the financial results, Fuld stated the following:

> Despite what continues to be a difficult operating environment, the Firm's results for the quarter highlight our ability to perform across market cycles and deliver value to our shareholders. Our global franchise and brand have never been stronger, and our record results for the year reflect the continued diversified growth of our businesses. As always, our people remain committed to managing risk and providing the best solutions to our clients.

68.    On January 29, 2008, Lehman Brothers filed its annual report for fiscal year 2007 on Form 10-K with the SEC ("2007 Form 10-K"). The Company's 2007 Form 10-K reaffirmed the financial results previously announced on December 13, 2007.

69.    On March 18, 2008, the Company issued a press release announcing the financial

results for the first quarter of 2008. The Company reported a profit of $489 million and

disclosed that it held $6.5 billion in "other asset-backed securities" and that it had taken a writedown of

just $200 million to reflect the decreased value of those securities. These announcements served to

reassure the investing public, which was concerned about the impact of the roiling credit market on

Lehman Brothers, particularly in the wake of the collapse of Bear Stearns just days earlier. The press

release stated in pertinent part as follows:

> NEW YORK– March 18, 2008 – Lehman Brothers Holdings Inc. (ticker symbol:
> LEH) today reported net income of $489 million, or $0.81 per common share
> (diluted), for the first quarter ended February 29, 2008, representing decreases of
> 57% and 59%, respectively, from net income of $1.15 billion, or $1.96 per
> common share (diluted), reported for the first quarter of fiscal 2007. Fourth
> quarter fiscal 2007 net income was $886 million, or $1.54 per common share
> (diluted).
>
> First Quarter Business Highlights
>
> Experienced record client activity across our Capital Markets businesses, which
> was offset, in part, by the effect of the continued dislocations in the credit
> markets that significantly impacted the Firm's results
>
> *   *   *
>
> Net Revenues
>
> Net revenues (total revenues less interest expense) for the first quarter of fiscal
> 2008 were $3.5 billion, representing decreases of 31% and 20%, respectively,
> from $5.0 billion reported in the first quarter of fiscal 2007 and $4.4 billion
> reported in the fourth quarter of fiscal 2007. Net revenues for the first quarter of
> fiscal 2008 reflect negative mark to market adjustments of $1.8 billion, net of
> gains on certain risk mitigation strategies and certain debt liabilities.
>
> Business Segments
>
> Fixed Income Capital Markets reported net revenues of $262 million
> a decrease of 88% from $2.2 billion in the first quarter of fiscal 2007,
> as strong performances in liquid products such as high grade corporate

23

debt, foreign exchange and interest rate products were offset, in part, by continued deterioration in the broader credit markets, in particular residential mortgages, commercial mortgages and acquisition finance.

* * *

70.     Commenting on the financial results, Fuld stated the following:

In what remains a challenging operating environment, our results reflect the value of our continued commitment to building a diversified platform and our focus on managing risk and maintaining a strong capital and liquidity position. This strategy has allowed us to support our clients through these difficult and volatile markets, while continuing to build and strengthen our global franchise for our shareholders.

71.     Also on March 18, 2008, the Company held a conference call to discuss the financial results. During the conference call, Erin Callan ("Callan"), the Company's Chief Financial Officer, further reassured the market about the Company's strength and stability relative to its exposure to the mortgage and credit markets.  Callan made the following false statements:

We saw a quarter where our risk management discipline allowed us to avoid any single outsized loss. And it's been our operating philosophy for a decade, which many people are very familiar with, that we remain closely focused on our liquidity, our long-term capital position precisely for the purpose of weathering a difficult market environment that we've seen surfacing in recent weeks. So we're set up for that.

* * *

So I think it's fair to say we continue to do a very, very good job managing the risk on residential mortgages, an area that I think we are credited with a lot of expertise, a great franchise.

* * *

Let me talk about outlook for a moment, which you've probably gotten message so far, but looking forward, despite the positive developments of Fed actions in the past two days and few weeks, we still don't anticipate the challenging market conditions abating any time soon and we have planned our business accordingly. As we look out to the remainder of the year, we certainly will remain vigilant around risk, capital, and liquidity. As we talked about last quarter, as a firm we remained very cautious overall, but we continue to feel good about our competitive position.

* * *

Now, let me conclude by noting that we don't expect that this extremely challenging period is going to end in the near term. However, we do believe we have the leadership, the experience, the risk management discipline, the capital strength, and certainly the liquidity to ride out the cycle. In addition, we believe that the current markets will continue to present us with a lot of client and trading opportunities which we look forward to that come from market dislocation. And as we successfully meet these challenges, capture these opportunities, we certainly believe we are positioning ourselves well for the long-term.

72.     With regard to the Company's capital requirements, Callan stated:

We had disciplined liquidity and capital management, which we consider to be a core competency, and maintain robust liquidity to date and we have executed close to two thirds of our full-year capital plan at the end of the first quarter.

* * *

The average tenor of our long-term debt has continued to extend and is seven years at this point. We do believe that long-term debt in general will be harder to obtain throughout 2008, we had that strong point of view since late last year and therefore we will continue to pre-fund as we have done so far this year, our liquidity needs, as we see opportunities in the markets. And consistently with that, we have already completed two-thirds of our capital plan needs for 2008 as we come out of the first quarter.

73.     On April 8, 2008, Lehman Brothers filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2008 ("First Quarter 2008 Form 10-Q"). The First Quarter 2008 Form 10-Q reaffirmed the financial results for the Company previously released on March 18, 2008.

74.     However, the First Quarter 2008 Form 10-Q also acknowledged that the entire $6.5 billion of Lehman Brothers' "other asset-backed securities" consisted of CDOs, and revealed for the first time that 25% of those securities were rated BB+ or lower – a junk rating.

75.     The First Quarter 2008 Form 10-Q stated the following regarding the Company's investments in "other asset-backed securities," including CDOs:

The Company purchases interests in and enters into derivatives with collateralized debt obligation securitization entities ("CDOs"). The CDOs to which the Company has exposure are primarily structured and underwritten by third parties. The collateralized asset or lending obligations held by the CDOs are generally related to franchise lending, small business finance lending, or consumer lending. Approximately 25% of the positions held at February 29, 2008 and November 30, 2007 were rated BB+ or lower (or equivalent ratings) by recognized credit rating agencies. In determining the fair value interests in CDOs, the Company considers prices observed for similar transactions and data for relevant benchmark instruments, such as swap obligations for similar obligations referenced by the instrument. In both reference periods, the value in the benchmark instruments as well as market developments caused a decline in the fair value of interests in CDOs, not actual defaults on swap obligations.

76.     The First Quarter 2008 Form 10-Q further questions about the value of the Company's assets. Specifically, the Form 10-Q reported that the Company held $38.8 billion in "Level 3" assets, which are illiquid assets that trade so infrequently that there is no reliable market price for them, and which are valued based on management assumptions. Level 3 assets include CDOs and other derivative securities, and the infrequent trading market for these assets was particularly difficult since the market for such instruments all but evaporated in 2007 in the wake of the sub-prime mortgage collapse.

77.     As of the first quarter 2008, Level 3 assets represented 5% of the Company's total assets, and totaled 171% of its shareholder equity. Strikingly, while the First Quarter 2008 Form10-Q reported a $228 million gain on those Level 3 assets during the first quarter, Callan had stated during the Company's March 18, 2008 conference call that Lehman Brothers had written down the value of its Level 3 assets by $875 million.

78.     At the *Ira Sohn Investment Research Conference* held on May 21, 2008, David Einhorn, President of hedge fund Greenlight Capital LLC, provided a presentation in which he analyzed the inconsistencies between Lehman Brothers' March 18, 2008 financial results

announcement and the Company's First Quarter 2008 Form 10-Q filed with the SEC on April 8, 2008. During the presentation, Einhorn laid out the inexplicably small write-down taken on Lehman Brothers' CDO portfolio and the more than $1 billion disparity between the reported values of the Company's Level 3 assets between March 18 and April 8. Mr. Einhorn recounted his efforts to obtain an explanation from Lehman, and the constantly changing – and largely implausible – stories that Company management provided in response. Indeed, Mr. Einhorn explained that, when he asked Callan to clarify how Lehman Brothers could justify writing down just 3% of those securities, Callan responded that the Company "would expect to recognize further losses" during the second quarter of 2008.  Following Mr. Einhorn's presentation, Lehman Brothers' stock closed at $39.56 per share, down $2.44 for the day.

79.     The implication of Mr. Einhorn's presentation, beyond the potential losses That Lehman Brothers had yet to reveal, is that the Company's reported first quarter profit was achieved only by overstating the value of its mortgage-backed assets and improperly deferring recognition of losses to later periods. In the wake of Mr. Einhorn's presentation, the price of Lehman Brothers' shares fell nearly $6 per share, or almost 15%, over the following days.

80.     On June 2, 2008, Standard & Poor's lowered its credit rating for Lehman Brothers, citing questions about the Company's financing of its operations. Lehman Brothers' shares fell nearly $3, or 8%, in response to that downgrade.

81.     The Company faced continuing concerns about its liquidity the following day, as Lehman Brothers was forced to deny rumors that it had resorted to borrowing from the Federal Reserve's "discount window." But a report on June 3, 2008 in *The Wall Street Journal* that Lehman Brothers intended to raise an additional $4 billion in capital – following upon other

significant fund raising earlier in 2008, including a $4 billion bond offering in January 2008 and

the sale of $1.9 billion in preferred shares in February 2008 – heightened concerns about the

Company's ability to access the capital it needed. Lehman Brothers' shares fell another $3 per

share on June 3, 2008 in response to those concerns.

     82.    On June 9, 2008, prior to the market opening, Lehman Brothers issued a

press release announcing, one week ahead of schedule, the financial results for the second quarter

of 2008. Lehman Brothers reported a net loss of $2.8 billion – nearly ten times the loss analysts

had anticipated and the first quarterly loss in the Company's history – following write-downs of

$3.7 billion to the Company's mortgage-backed assets. The press release stated in relevant part:

> NEW YORK, June 9, 2008 – Lehman Brothers Holdings Inc. (ticker symbol:
> LEH) announced today that continued challenging market conditions will result in
> an expected net loss of approximately $2.8 billion, or ($5.14) per common share
> (diluted) for the second quarter ended May 31, 2008, compared to net income of
> $489 million, or $0.81 per common share (diluted), for the first quarter of fiscal
> 2008 and $1.3 billion, or $2.21 per common share (diluted), for the second quarter
> of fiscal 2007. For the first half of fiscal 2008, the Firm expects to report a net
> loss of approximately $2.3 billion, or ($4.33) per common share (diluted),
> compared to net income of $2.4 billion, or $4.17 per common share (diluted), for
> the first half of fiscal 2007.
>
> The Firm expects to report net revenues (total revenues less interest expense) for
> the second quarter of fiscal 2008 of negative ($0.7) billion, compared to $3.5
> billion for the first quarter of 2008 and $5.5 billion for the second quarter of fiscal
> 2007. Net revenues for the second quarter of fiscal 2008 reflect negative mark to
> market adjustments and principal trading losses, net of gains on certain debt
> liabilities. Additionally, the Firm incurred losses on hedges this quarter, as gains
> from some hedging activity were more than offset by other hedging losses. For
> the first six months of fiscal 2008, the Firm expects to report net revenues of $2.8
> billion, compared to $10.6 billion for the first half of fiscal 2007.
> During the fiscal second quarter, the Firm further strengthened its liquidity and
> capital position (all below amounts estimated as of May 31, 2008):
>
> • Grew the Holding Company liquidity pool to an estimated $45 billion from
> $34 billion at the end of the prior quarter

• Decreased gross assets by approximately $130 billion and net assets by approximately $60 billion

• Reduced exposure to residential mortgages, commercial mortgages and real estate investments by an estimated 15-20% in each asset class

• Increased the Firm's long-term capital through the issuance of $4 billion of convertible preferred stock in April and approximately $5.5 billion of public benchmark long-term debt

* * *

Business Segments

Fixed Income Capital Markets is expected to report net revenues of negative ($3.0) billion, compared to $0.3 billion in the first quarter of 2008 and $1.9 billion in the second quarter of 2007. Excluding mark to market adjustments, related hedges and structured note liability gains, client activity in securitized products, municipals and commodities remained strong, while credit, interest rate and financing were down from last quarter but each up versus the year ago period.

83.    Commenting on the financial results, Fuld stated the following:

I am very disappointed in this quarter's results. Notwithstanding the solid underlying performance of our client franchise, we had our first-ever quarterly loss as a public company. However, with our strengthened balance sheet and the improvement in the financial markets since March, we are well-positioned to serve our clients and execute our strategy.

84.    Also on June 9, 2008, Lehman Brothers issued a press release announcing that it raised $6 billion in capital – 50% more than previously reported – through the sale of $4 billion in common stock and $2 billion in preferred stock, thus further diluting the position of current shareholders.

85.    After Lehman's disclosure, Moody's downgraded its rating of Lehman

Brothers to "negative" from "stable" citing concerns about its exposure to real estate. In addition, the price of the Lehman's shares fell 12%, dropping from $32.29 to close at $28.47 on June 9, 2008.

86. The extent of the Company's losses and write-downs was staggering. David Hendler, an analyst at CreditSights Inc. in New York stated: "It's kind of sobering for people who have been listening to the company these last six to nine months that they had everything under control.

87. Similarly, a *Bloomberg* article entitled "Greenlight's David Einhorn Sees Additional Losses at Lehman" echoed these concerns:

> David Einhorn, president of hedge fund Greenlight Capital LLC, comments on Lehman Brothers Holdings Inc.'s $6 billion capital raise and $2.8 billion second quarter loss. Einhorn, who's betting Lehman shares will fall, spoke in an interview today after the firm held a conference call with investors. Einhorn is the author of "Fooling Some of the People All of the Time," a book he's promoting about his experience betting against Allied Capital Corp.
>
> On additional losses:
>
> "The call did nothing to allay my suspicions that there are additional losses that Lehman has not yet recognized."
>
> "There are signs already from the press release that the company has more to go, particularly in the commercial mortgage backed securities areas, where they only wrote down $700 million gross. It's unclear to me why the writedown would be so small."
>
> "The burden is on them to be much more forthcoming and transparent in their disclosures and discussion and analysis of their high-risk assets."
>
> On the $6 billion capital raise:
>
> "This is the third capital raise. The first two they said they didn't need to do. This one is not to install confidence. It's not to go after short sellers. It is to replace losses. They are raising $6 billion of capital that they said they didn't need in order to replace losses that they said they did not have."

On management's credibility:

"This raises management credibility issues. These results combined with their previous statements raise further management credibility issues."
This "confirms a lot of things we've been saying. The credit market did not really deteriorate between February and May. Most of these losses are losses that were probably evident quarters ago."

88.     On June 10, 2008, *The Wall Street Journal* published an article entitled

"Big Loss at Lehman Intensifies Crisis Jitters." The article stated in part:

Lehman's larger-than-expected loss was accompanied, as anticipated, by word that the firm will seek to raise $6 billion in fresh capital. On Wall Street, the loss underscored the challenges Lehman and its rivals must face as they dramatically reduce their reliance on borrowed money. The use of debt, which helped fuel record profits when markets were booming but also led to excessive risk-taking, has come back to haunt them.

\* \* \*

Lehman shares tumbled 8.7%, or $2.81, to $29.48 in New York Stock Exchange composite trading at 4 p.m. Lehman plans to offer $4 billion in common stock, priced at $28 a share, and another $2 billion in preferred shares that will convert to common stock.

Part of the stock decline stems from investor frustration over the $6 billion in fresh capital raised by the company. That infusion has increased its cushion against potential losses but is diluting the value of Lehman's common-stock by about 30%.

Some shareholders have grown increasingly leery of Lehman's management, which has bolstered its balance sheet with $12 billion so far this year. In mid-March, Lehman Chief Financial Officer Erin Callan said the firm "took care of our full-year needs" when it raised $1.9 billion through an offering of preferred stock in February. In late March, Lehman raised another $4 billion. Although it said the money wasn't really needed, it wanted to allay fears about its capital position in the wake of the sale of Bear to J.P. Morgan.

"There is a credibility issue here," said William B. Smith, president of SAM Advisors LLC, which holds about 45,000 Lehman shares and was buying more Monday. "Never did I ever think I would say that Fuld and his team had one, but

they do. If you don't need capital, why are you raising it?"

* * *

Moody's Investors Service lowered its outlook for the bank's credit ratings to negative, expressing concerns about Lehman's ability to manage the risks in its still-large exposures to commercial and residential mortgages and signaling the market may not have much tolerance for further losses.
"The rating action also reflects Moody's concerns over risk management decisions that resulted in elevated real estate exposures and the subsequent ineffectiveness of hedges to mitigate these exposures in the recent quarter," Moody's wrote in a release. "Any additional net valuation marks that result in firm-wide losses in coming quarters would raise serious concerns about the effectiveness of Lehman's risk management and may create additional market unease about the firm, potentially weakening its franchise."

89.     Finally, on June 12, 2008, Callan and Gregory were ousted from their positions with the Company as a result of the losses. The Company named Herbert (Bart) H. McDade III as President and Chief Operating Officer, and Ian Lowitt as Chief Financial Officer. Also on June 12, the *Associated Press* published an article entitled "Lehman Brothers Removes Finance, Operating Chiefs." The article stated in relevant part:

NEW YORK (AP) -- Lehman Brothers Holdings Inc. shook up its management Thursday, removing two top executives in a concession that attempts to quell Wall Street anger over recent losses have failed.

The nation's fourth-largest investment bank said Chief Financial Officer Erin Callan and Chief Operating Officer Joseph Gregory have been removed from their positions, days after the investment bank announced a $3 billion quarterly loss.

Investors were shaken after the company disclosed Monday it needed $6 billion of fresh capital to offset that loss, its first since going public in 1994.
"When you have a stumble of this magnitude, change is not a bad thing," said Lauren Smith, an analyst with Keefe, Bruyette & Woods. "I view the change, on the margin, as a good thing, but this runs a lot deeper than just changing a few high level managers."

Since March, Callan had been taking on an increasingly more prominent profile as the face of Lehman during the credit crisis. She regularly met with analysts and

appeared at investor conferences to talk up the company.

On Monday, Callan again waved the flag -- telling analysts on a telephone call that Lehman's books were in order and that the fresh dose of capital would allow traders to pursue new opportunities. But her pep talk failed and shares began to plummet toward a record low.

The lack of confidence in Lehman's leadership has been hanging over the company for weeks, and it was unclear if the management upheaval will be enough to satisfy critics.

Shares have lost more than 20 percent this week and were down nearly 2 percent at midday.

90.     The statements issued by Lehman Brothers in ¶ 51-81 were materially false and misleading for at least the following reasons:

(a)     they failed to disclose the extent and nature of the Company's exposure to the sub-prime mortgage market and the losses that the Company would incur from that exposure;

(b)     they failed to disclose the Company's failure to timely write-down its positions on CDOs and other mortgage-backed securities;

(c)     they overstated the value of the Company's mortgage-backed assets;

(d)     they failed to disclose the Company's improper recognition of losses to later periods in order to report continued profits in earlier periods;

(e)     they failed to disclose the inadequate sub-prime mortgage related reserves; and

(f)     they failed to disclose the Company's inadequate internal and financial controls.

## IX.   CAUSES OF ACTION

### A.   Count I: Failure to Prudently and Loyally Manage the Plan and Assets of the Plan

91.   Plaintiff incorporates by reference the paragraphs above.

92.   This Count alleges fiduciary breach against all Defendants other than the Director Defendants (the "Prudence Defendants").

93.   As alleged above, during the Class Period, the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

94.   As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries and with the care, skill, diligence, and prudence required by ERISA. The Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

95.   Yet, contrary to their duties and obligations under the Plan documents and ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, these Defendants knew or should have known that the Fund was no longer a suitable and appropriate investment for the Plan, but was, instead, an

imprudent investment in light of the Company's material undisclosed fundamental weaknesses.

96.     Nonetheless, during the Class Period, these Defendants continued to permit the Plan to offer the Fund as an investment option for Employee and Matching Contributions and continued to permit the Plan to invest those contributions in the Fund and permit the Fund to invest in Company stock.  They did so despite the fact that they knew or should have known that the prices of Fund and Company stock shares was artificially inflated.

97.     The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets.  However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.

98.     The Prudence Defendants had a duty to follow a regular, appropriate systematic procedure to evaluate the prudence of investing in the Fund, but had no such procedure.  Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in the Fund.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in the Fund under these circumstances.

99.     The Prudence Defendants' breached their fiduciary duty respecting the Plan's investment in Company stock described above, under the circumstances alleged herein, in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.

100.    The Prudence Defendants were obligated to discharge their duties with respect to

the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

101.   According to United States Department of Labor ("DOL") regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

102.   According to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

(a)   A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

(b)   Consideration of the following factors as they relate to such portion of the portfolio:

(i)   The composition of the portfolio with regard to diversification;

(ii)   The liquidity and current return of the portfolio relative to the

36

anticipated cash flow requirements of the plan; and

          (iii)    The projected return of the portfolio relative to the funding objectives of the plan.

103.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Company stock because, among other reasons:

104.    The Prudence Defendants knew of and/or failed to investigate the failures of the Company as alleged above.

105.    The risk associated with the investment in Company stock during the Class Period was by far above and beyond the normal, acceptable risk associated with investment in company stock.

106.    This abnormal investment risk could not have been known by the Plan's Participants, and the Prudence Defendants knew that it was unknown to them, as it was to the market generally, because the fiduciaries never disclosed it.

107.    Knowing of this extraordinary risk, and knowing the Participants did not know it, the Prudence Defendants had a duty to avoid permitting the Plan or any Participant from investing the Plan's assets in the Fund or Company stock.

108.    Further, knowing that the Plan was not adequately diversified, but was heavily invested in Company stock, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

109.    The Prudence Defendants breached their fiduciary duties by, inter alia, failing to engage independent advisors who could make independent judgments concerning the Plan's

investment in the Company; failing to notify appropriate federal agencies, including the DOL, of

the facts and circumstances that made Company stock an unsuitable investment for the Plan;

failing to take such other steps as were necessary to ensure that Participants' interests were

loyally and prudently served; with respect to each of these above failures, doing so in order to

avoid adversely impacting their own compensation or drawing attention to the Company's

inappropriate practices; and by otherwise placing their own and the Company's improper

interests above the interests of the Participants with respect to the Plan's investment in Company

stock.

110.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged

in this Count, the Plan suffered tremendous losses.  If the Prudence Defendants had discharged

their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would

have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of

fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost

millions of dollars of retirement savings.

111.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2)

and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

appropriate.

**B.    Count II:  Failure to Provide Complete and Accurate Information to
Participants and Beneficiaries**

112.    Plaintiff incorporates by reference the allegations above.

113.    This Count alleges fiduciary breach against all Defendants other than the

Director Defendants (the "Communications Defendants").

114. As alleged above, during the Class Period the Communications Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

115. As alleged above, the scope of the Communications Defendants' duties included disseminating Plan documents and/or Plan-related information to Participants regarding the Plan and/or assets of the Plan.

116. The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan. This duty applies to all the Plan's investment options, including investment in Company stock.

117. This fiduciary duty to honestly communicate with Participants is designed not merely to inform Participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Communications Defendants facilitated the illegal conduct in the first instance.

118. The Communication Defendants were obligated to provide Participants with

39

complete and accurate information concerning all of the Plan's assets. However, their duties of honest disclosure were especially significant with respect to Company stock because: a) during the Class Period, a large percentage of the Plan's assets were invested in it; b) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and c) Participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock investment.

119.     The Communications Defendants breached their ERISA duty to inform Participants by failing to provide complete and accurate information regarding the Company and Company stock as alleged above, and, generally, by conveying through statements and omissions inaccurate information regarding the soundness of Company stock, and the prudence of investing retirement contributions in the stock.

120.     In particular, the Committee Defendants were responsible for communications made in the official Plan documents and materials which were disseminated directly to all participants to be used by participants in the management of the investment of their Plan accounts in the Fund, including the SPD and Prospectus which, on information and belief, incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports.

121.     These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in Company stock during the Class Period, with acquisitions of Company stock occurring at significantly inflated prices. Thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets. Had such disclosures been made to Participants, or Plan fiduciaries, if any, who were not

aware of facts alleged herein, Participants and fiduciaries could have taken action to protect the Plan, and the disclosure to Participants, which necessarily would have been accompanied by disclosure to the market, would have assured that any further acquisitions of Company stock by the Plan would have occurred at an appropriate price.

122.    As a consequence of the failure of the Communications Defendants to satisfy their duty to provide complete and accurate information under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in Company stock, or to appreciate that under the circumstances known or that should have been known to the Communications Defendants, but not known by Participants, Company stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.

123.    The Communications Defendants' failure to provide complete and accurate information regarding Company stock was uniform and Plan-wide, and impacted all Plan Participants the same way in that none of the Participants received crucial, material information regarding the risks of Company stock as a Plan investment option and all Plan acquisitions of employer stock during the Class Period occurred at inflated prices.

124.    As a consequence of the Communications Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Communications Defendants had discharged their fiduciary duties to prudently disclose material information, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

125.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and

1132(a)(2) and (a)(3), the Communications Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

C.    **Count III: Failure to Monitor Fiduciaries**

126.    Plaintiff incorporates by reference the allegations above.

127.    This Count alleges fiduciary breach against the Director Defendants (the "Monitoring Defendants").

128.    As alleged above, upon information and belief, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

129.    As alleged above, the scope of the fiduciary responsibilities of the Director Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of the Committee Defendants.

130.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

131.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work

42

and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

132. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the Plan and the plan assets, or that may have an extreme impact on the Plan and the fiduciaries' investment decisions regarding the plan.

133. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a) failing, at least with respect to the Plan's investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock;

(b) failing to ensure that the monitored fiduciaries appreciated the true extent of Company's inappropriate business practices, and the likely impact of such practices on the value of the Plan's investment in Company stock;

(c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the

Plan's investment in the Fund; and

> (d)     failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Fund despite the practices that rendered Company stock an imprudent investment during the Class Period.

134.     As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

135.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### D.     Count IV: Co-Fiduciary Liability

136.     Plaintiff incorporates by reference the allegations above.

137.     This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

138.     As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or de facto fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

139.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Co-Fiduciary Defendants breached all three provisions.

140.    Knowledge of a Breach and Failure to Remedy. ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches. In particular, they did not communicate their knowledge of the Company's improper activity to the other fiduciaries.

141.    In particular, because the Director Defendants knew of the Company's failures and inappropriate business practices, they also knew that the Prudence Defendants were breaching their duties by continuing to invest in Company stock. Yet, they failed to undertake any effort to remedy these breaches and, instead, compounded them by downplaying the significance of the Company's failed and inappropriate business practices and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

142.    Knowing Participation in a Breach. ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. The

45

Monitoring Defendants knowingly participated in the breaches of the Prudence Defendants

because, as alleged above, they had actual knowledge of the facts that rendered Company stock

an imprudent retirement investment and, yet, ignoring their oversight responsibilities, permitted

the Prudence Defendants to breach their duties.  Moreover, as alleged above, each of the

Defendants participated in the management of the Plan's improper investment in the Fund and,

upon information and belief, knowingly participated in the improper management of that

investment by the other Defendants.

143.    Enabling a Breach.  ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes

liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in

the administration of his specific responsibilities which give rise to his status as a fiduciary, he

has enabled another fiduciary to commit a breach.

144.    The Monitoring Defendants' failure to monitor the Prudence Defendants enabled

those Defendants to breach their duties.

145.    As a direct and proximate result of the breaches of fiduciary duties alleged

herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost

millions of dollars of retirement savings.

146.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2)

and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

appropriate.

## X.  CAUSATION

147.    The Plan suffered millions of dollars in losses of vested benefits because

46

substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in the Fund during the Class Period in breach of Defendants' fiduciary duties.

148.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Company stock as an investment alternative when it became imprudent, and divesting the Plan of Company stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it suffered.

## XI. REMEDY FOR BREACHES OF FIDUCIARY DUTY

149.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above and, therefore, knew or should have known that the Plan's assets should not have been invested in the Fund during the Class Period.

150.    As a consequence of the Defendants' breaches, the Plan suffered a significant loss of vested benefits.

151.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan….". Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate….".

152.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of:

            (a)    a monetary payment to the Plan to make good to the Plan the loss of

47

vested benefits to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

        (b)     injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3);

        (c)     reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

        (d)     taxable costs and interest on these amounts, as provided by law; and

        (e)     such other legal or equitable relief as may be just and proper.

## XII.    CLASS ACTION ALLEGATIONS

    153.    Class Definition.  Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of the Plan at any time between September 13, 2006 and the present, and whose accounts included investments in Lehman Brothers' stock.

    154.    Class Period.  The fiduciaries of the Plan knew or should have known at least by, September 13, 2006 that the Company's material weaknesses were so pervasive that Company stock could no longer be offered as a prudent investment for retirement Plan.

    155.    Numerosity.  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are,

based on the Plan Form 5500 Annual Return filed with the Internal Revenue Service ("IRS") and dated October 15, 2007, more than 22,000 members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

156.    Commonality.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plan suffered losses and, if so, what is the proper measure of damages.

157.    Typicality.  Plaintiff's claims are typical of the claims of the members of the Class because: (a) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claims on behalf of the Plan are not only typical of, but identical to claims under this section brought by any Class member; and (b) to the extent Plaintiff seeks relief under ERISA § 502(a)(3) on behalf of himself for equitable relief, that relief would affect all Class members equally.

158.    Adequacy.  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action,

complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

159.    **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

160.    **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Rule 23(b) because: (a) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (b) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (c) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including loss of vested benefits to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits

the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

      C.     Imposition of a constructive trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

      D.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

      E.     An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Company stock;

      F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

      G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

      H.     An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

      I.     An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated: July 9, 2008

PLAINTIFF,

By_____

Eric Palmquist (EP 6776)
William Bernarduci (WB 5785)
Robert A. Izard
Mark P. Kindall
**SCHATZ NOBEL IZARD P.C.**
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: (860) 493-6292
Facsimile:  (860) 493-6290

**MAJOR KHAN LLC**
Major Khan
20 Bellevue Terrace
Weehawken, NJ 07086
Tel: (646) 546-5664
Fax: (646) 546-5755

Attorneys for Plaintiff and the Class